HOUSEHOLD GOODS CARRIERS'
BUREAU, Defendant-Appellant,

v.

John J. TERRELL et al.,
Plaintiffs-Appellees.

John J. TERRELL, Plaintiff-Appellant,

v.

AERO MAYFLOWER TRANSIT COM-
PANY, Inc., et al., Defendants-
Appellees.

No. 25989.

United States Court of Appeals
Fifth Circuit.

Sept. 12, 1969.

Coleman, Circuit Judge, dissented in part.

Melville C. Williams, Chicago, Ill., for Household Goods Carriers' Bureau.

Jack N. Price, Longview, Tex., Ivan Williams, Fred B. Werkenthin, Herring & Werkenthin, Austin, Tex., for John J. Terrell.

Jay H. Brown, Austin, Tex., for Allied Van Lines and others.

James W. Wilson, Austin, Tex., James L. Beattey, Indianapolis, Ind., Hugh B. Cox, Washington, D. C., for Aero Mayflower Transit Co., Inc.

W. E. Cureton, Waco, Tex., F. Neil Aschemeyer, Gregory M. Rebman, St. Louis, Mo., for United Van Lines.

Before JONES and COLEMAN, Circuit Judges, and CHOATE, Senior District Judge.

CHOATE, Senior District Judge:

This private antitrust action was brought by John J. Terrell against the Household Goods Carriers' Bureau and ten of its individual members,[1] claiming that the Bureau and certain of its members conspired with Rand McNally and Company[2] to restrain and monopolize commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. A jury found for Terrell and awarded $375,000 in damages (trebled to $1,-125,000). The trial judge granted the individual carriers' motion for judgment notwithstanding the verdict, but the verdict against the Bureau was allowed to stand. The Bureau appeals from the judgment in favor of Terrell and Terrell appeals from the judgment N.O.V. in favor of the carriers.

The defendant, Household Goods Carriers' Bureau, organized in 1936, pursuant to the Reed-Bulwinkle and Interstate Commerce Commission Acts, is an organization of about 1,700 members, carriers of household goods, for whom it files a joint tariff with the Interstate Commerce Commission. Each carrier was required to file a tariff with the ICC; to accomplish this, the members executed a power of attorney in favor of the Bureau. The Bureau also publishes for its members a national mileage guide, which is a tariff publication containing maps and charts to determine highway distances between principal points in the United States and from which transportation charges are computed. The instant case involves the marketing of these national mileage guides.

1. Aero Mayflower Transit, Allied Van Lines, Inc., Bekins Van Lines, Inc., Central Forwarding, Inc., Global Van Lines, Inc., Lyon Van Lines, Inc., National Van Lines, Inc., North American Van Lines, Inc., United Van Lines, Inc., Wheaton Van Lines, Inc.

2. Rand McNally was not made a party to this litigation.

Mileage guides are used for the purpose of determining distances in the computation of transportation charges (e. g., by trucking firms) and travel allowances (e. g., by the government). Prior to Terrell's entrance on the scene, the Bureau and Rand McNally were the sole distributors of such guides by virtue of the simple fact that there was no competition in the field.[3] In 1962 Terrell, who had previously done some work for Rand McNally, began to attempt to market a national guide in competition with that of the Bureau and Rand McNally.[4] By using different methods to compute mileages,[5] Terrell's guide would frequently reflect shorter distances than the Bureau's guide and was allegedly better suited to the needs of certain types of users, particularly the military.

Terrell contended at trial that the Bureau, conspiring with various of its members and Rand McNally, illegally prevented him from entering the market.[6] Terrell relied heavily on three "overt acts" that were said to be in furtherance of the conspiracy. We shall refer to these incidents, as do the parties, as the "Finance Center incident," the "D.T.M.S. incident," and the "Wyche letter."

*The "Finance Center Incident"*

In 1963, Terrell attempted to sell his guide to the Finance Center of the United States Department of Defense. Until that time the Center had been using the Bureau's guide to compute distances for military travel allowances. The Center made a thorough comparison of the two guides which resulted in a recommendation to adopt Terrell's guide. Shortly thereafter, however, pressure was brought to bear through direct contact by the Bureau and Rand McNally and "congressional inquiry" letters from United States senators that were secured through the efforts of the Bureau and Rand McNally. Terrell's guide was not adopted.

*The "D.T.M.S. Incident"*

The Defense Traffic Management Service (D.T.M.S.) is a government agency which, pursuant to regulations, awards shipments of military household goods to carriers "who provide high-quality service at the lowest over-all cost." Prior to Terrell, all carriers quoted similar rates and an "equitable distribution" system was used to award military shipments to eligible carriers. Terrell convinced one such carrier, Mr. Rocky Ford, to adopt his guide. When Ford quoted a lower rate (because of the shorter distances in Terrell's guide) D.T.M.S. took the application under advisement. D.T.M.S., after meeting wtih agents from the Bureau (Mr. Wyche) and Rand McNally, decided that the increased administrative expense of checking both the Terrell and Rand McNally guides when an application was made required that the equitable distribution system be maintained.

*The "Wyche Letter"*

Mr. Wyche, executive secretary of the Bureau, received a letter from Rocky

---

3. Terrell in his pleadings and by brief, characterizes the relationship between the Bureau and Rand McNally as a "monopoly by combination." The Bureau would purchase guides from Rand McNally and resell them to its members. Although Rand McNally sold guides to rate and tariff agencies other than the Bureau it did so at prices subject to the Bureau's approval and on the stipulation that it would credit the Bureau with these independent sales toward the Bureau's guarantee of a minimum number of purchases from Rand McNally. There was evidence that the Bureau exercised a degree of control over the methods by which Rand McNally would compute distances.

4. Terrell had previously published a guide that was used in Texas by the state government and intrastate carriers.

5. Terrell computed distances from several maps and, if he deemed it reliable, would use the map showing the shortest distance in his actual computation. Other techniques were the use of all-weather roads, whether state or federal, and computation from the geographical center of cities.

6. There is no doubt that Terrell was ultimately unsuccessful in marketing his guide.

Ford Van Lines, a member of the Bureau, requesting that the Bureau adopt Terrell's guide. The "Wyche letter," addressed to Mrs. Annie Ford, was written in response. In the letter Wyche made the following comments: (1) he was "amazed that the guide was ever permitted to be filed with the Commission [ICC] because of conflicting information contained therein;" (2) he felt that the distances used by Terrell in his guide were not independently computed but were obtained from the Bureau guide and then reduced five, ten or fifteen miles; (3) he expressed doubt as to whether the distances used by Terrell could be computed scientifically or confirmed by existing highways routes; (4) he commented on the effect the guide would have on the transportation industry:

> "We are quite concerned with respect to a competitive condition arising by, movers particularly, utilizing some other method of mileage determination that we get to a point with the moving industry wherein carriers' rates, by reducing mileages, will create utter confusion within the industry."

(5) he announced plans to file a complaint with the ICC and to request an investigation as to the methods used by Terrell, and (6) he urged Rocky Ford to reconsider its decision to change guides.

Although the letter did not initially alter Rocky Ford's decision, Howard Ford, a part owner of Rocky Ford Van Lines, was concerned. Howard Ford sent a copy of the letter to the Oilfield Hauler's Association, another tariff agency of which Rocky Ford Van Lines was a member. The Association, which had previously indicated that it would adopt Terrell's Guide, called upon Terrell to explain those matters mentioned in the Wyche letter. The ultimate result was that neither Rocky Ford Van Lines nor the Oilfield Hauler's Association used Terrell's guide.

The Bureau's primary contention on appeal is that the Sherman Act does not prohibit the Bureau's role in the Finance Center and D.T.M.S. incidents, even if deemed illegal, and that Terrell's reliance on the Wyche letter is barred by res judicata. The Bureau thus contends that with these three matters excluded from consideration there is scant evidence, if any, to support the verdict. We first turn to the contention that reliance on the Wyche letter is barred by res judicata.

Prior to the initiation of the anti-trust suit, Terrell sued the Bureau and certain of its members, alleging that portions of the Wyche letter were libelous (i. e., Wyche's assertion that Terrell had arbitrarily deducted distances from the Bureau's guide and that Terrell's guide could not be "scientifically" substantiated). The anti-trust suit was pending, however, when the libel suit went to trial. After the libel trial, which ended with the jury being unable to reach a verdict regarding the Bureau,[7] Terrell and the Bureau arrived at a settlement and the libel suit was dismissed with prejudice.

In the anti-trust claim, of course, the letter was not the basis of the "cause of action" but was offered as *evidence* of one of the elements of the claim. Thus, the prior judgment could operate as an estoppel, insofar as relevant to the anti-trust suit, only as to matters actually concluded in previous case. Syms v. McRitchie, 187 F.2d 915, 918 (5 Cir. 1951). In the usual case, the inquiry would focus on the record of the former trial to determine "with certainty that that fact or issue was indeed litigated and decided on its merits. * * *." Kelliher v. Stone & Webster, 75 F.2d 331, 333 (5 Cir. 1935). Here however, the libel trial itself was abortive and decided nothing; rather, the case concluded upon the *stipulation* of the parties. Of course, this stipulated dismissal might have been predicated upon many considerations, including a mere desire to avoid future

---

7. A directed verdict was entered in favor of the individual members.

litigation. But in this suit between the same parties [8] the stipulation is conclusive regarding those matters that were necessarily resolved in the former suit. Thus the letter, insofar as it was asserted to be libelous, may not be asserted here as a ground for relief even though the letter has relevance as evidence of the claim here sued on.

The trial judge, in handling this rather tricky situation, did not exclude the letter or any part of it from the jury's consideration. Rather, the jury, at the close of all the evidence, was merely instructed that no damages could be awarded "for any injury or damage which was caused, or alleged to have been caused, by any statement in the [Wyche] letter which you may regard as being false." Examination of the record reveals that this procedure did not adequately protect those rights created by the dismissal of the libel case.

 Terrell has been paid for any harm attributable to the "false" portions of the Wyche letter. Concurrently, Terrell is forever barred from again asserting those matters as a right to relief. Thus, while the letter was admissible evidence in the antitrust suit, there was present the inherent danger that the antitrust suit would include what, in substance, was a re-trial of the libel case. In the instant case, the danger became reality; the "false" portions of the Wyche letter were directly and vigorously asserted as a ground for relief in the anti-trust suit to such a degree that it cannot be said that the rights created by the dismissal of the libel case were not materially prejudiced.

Terrell's counsel's closing argument to the jury serves as illustration. After stating that "the Court is going to tell you that you can't consider the untruthfulness of these accusations [contained in the letter]", counsel proceeded to argue as follows:

"* * * and now, although they attempted, when this case started, to defend [the statements] as being true, they have given up all hope of that, and will even admit that they are not true.

\* \* \* \* \* \*

Now, this letter was vicious, it was untrue, and it was calculated * * *

\* \* \* \* \* \*

[Wyche] admits that he knew when he wrote this letter that the Rand McNally guide had twenty-seven thousand errors in it; he admits that he knew that this statement he made about all the distances being shorter in Mr. Terrell's guide was untrue, because there had been a check, and this was known by that check to be untrue at the time he wrote it. He knew that there was absolutely no pattern of mileages being arbitrarily deducted by five, ten or fifteen miles, which he claimed in that letter, in Mr. Terrell's guide. He knew all of these facts.

\* \* \* \* \* \*

I don't believe anybody who heard Mr. Terrell testify can doubt his sincerity or his honesty. Mr. Terrell is a man who has been wronged and who seeks redress, more than being restored for the money he has lost and the opportunity he has lost. Mr. Terrell wants and he deserves, vindication for himself and his pride and his product."

The trial court's admonition to the jury to award no damages for any injury caused by any statement in the letter "which you may regard as being false" was plainly inadequate. Terrell has had his day in court on that score and the Bureau's objection to the admission of the "false" parts of the letter should have been sustained. While a new trial is required for the reason stated, the issues raised by the admission into evidence of the Finance Center and D.T.M.S. incidents, as well as the issues concerning damages, are deserving of comment.

By pre-trial order, reference to the Finance Center and D.T.M.S. episodes

---

8. Compare Seaboard Air-Line RR Co. v. George F. McCourt Trucking Inc., 277 F.2d 593 (5 Cir. 1960).

during the course of the trial was prohibited unless the court's permission had first been obtained. This ruling, we assume, was based on United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), wherein the Court stated that

> Joint efforts to influence public officials do not violate the anti-trust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626.

As a qualification to this broad rule, the Court noted that

> It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis of a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.' 381 U.S. 657, 670–671, note 3, 85 S.Ct. 1585, 1593–1594, 14 L.Ed.2d 626.

On the second day of trial the plaintiff was allowed to introduce evidence regarding the government agencies. Ultimately, both parties' attempts to influence these government agencies, through political pressures and otherwise, were the subject of a rather significant portion of the evidence. The Bureau, noting that these events are not actionable in and of themselves, primarily objects to the scope and the extent of the examination into these occurrences.

Under *Pennington*, the evidence was admissible, if at all, to show the "purpose and character of the particular transactions under scrutiny." Here, there were only two relevant matters which the government evidence might amplify; one, the relationship of the Bureau and Rand McNally as alleged conspirators and two, the motive and object of the communications with Rocky Ford and the Oilfield Hauler's Association. In other words there was, in essence, only one actionable occurrence which was alleged to have resulted from a joint effort to maintain a monopoly position. Viewed in this light, the scope of the "purpose and character" evidence becomes more critical and any evidence not having a direct bearing on those issues could be most prejudicial. Recognizing that the admission of this evidence rests initially within the sound discretion of the trial judge, we take this opportunity only to point out that this discretion is limited by the circumstances of this case. This is not a situation where the evidence might be regarded as cumulative; [9] quite the contrary, the danger here is that the "purpose and character" evidence will receive such force and weight so as to preclude a fair verdict on the substantive basis of the claim. [10] On re-trial, the evidence regarding efforts to influence public officials can be limited in such a way as to vitiate this possibility.

The Bureau also complains of plaintiff's theory of damages and the evidence adduced to support it. Noting that the Oilfield Hauler's Association was the *only* customer claimed to have been lost as a direct result of the Wyche letter, the Bureau emphasizes Terrell's concession that he could not have made a profit on their business alone. Thus, the Bureau first contends that there was no evidence whatever that Terrell was damaged since Terrell could not demonstrate a loss

---

9. See United States v. Johns-Manville Corp., 259 F.Supp. 440, 453 (E.D.Pa. 1966).

10. We note that the jury was instructed, as it was regarding the "false" portions of the Wyche letter, to award no damages for any harm arising out of the government episodes. Thus, with the Rocky Ford-Oilfield Hauler's Association occurrence left as the only actionable event (and this was largely restricted to the "truthful" part of the Wyche letter wherein Wyche threatened to file a complaint with the ICC), the size of the jury's verdict is indication that the instructions were not heeded.

of profits by virtue of the asserted anti-trust violation.

Terrell's theory was to the effect that with one firm customer, numerous others would fall in line; that the market was not completely developed; and that his guide had certain features that would persuade certain types of carriers to use two guides. Assuming evidentiary support, plaintiff's theory is not unsound. Plaintiff would not be foreclosed from recovery merely because he could not demonstrate a precise and ascertainable loss of profits from a particular customer. See North Texas Producers Asso. v. Young, 308 F.2d 235 at 242–243 (5 Cir. 1962).

The Bureau nevertheless objects to plaintiff's *method* of proving loss of profit. At trial, plaintiff introduced a projection of profits premised on hypothetical sales of 22,500 of his guides at $15 each, with a new guide being issued in 1962, 1964, 1966, and 1968. The projected profits, on this basis, totalled $888,402.14. The assumed figure of 22,-500 sales per issue was premised on the *Bureau's* 1962 guaranty of minimum purchases from Rand McNally. Plaintiff asserts, on the basis of Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 383 F.2d 97 (5 Cir. 1967), that defendant cannot complain of the fact that plaintiff based its hypothetical volume of sales on defendant's figures.

In *Cherokee* the plaintiff had initially developed the market regarding the product in question. In time, however, the defendant *replaced* the plaintiff as *sole* distributor of the product. Thus, the Court held that plaintiff was justified in relying on "the only figures available," i. e., those of the defendant after it had replaced plaintiff as sole distributor. The assumption was that, but for the anti-trust violation by defendant, the plaintiff's and defendant's roles would have been reversed.

Such was not the case here. We recognize that once the fact of injury has been established, the "plaintiff is not required to prove its damages with absolute mathematical certainty and that the plaintiff is not to be denied damages simply because they cannot be computed with exactness." Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6 Cir. 1962). Further, defendant has little room to complain about a lack of evidence for which he is responsible (i. e., lost profits), "if the method [of proof] allowed by the trial court is reasonable under the facts and in the circumstances of the case." North Texas Producers Asso. v. Young, 308 F.2d at 245. We merely hold that *Cherokee* does not authorize plaintiff to assume defendant's sales figures without other evidentiary support for such a proposition. "There must be some evidentiary basis to support an inference as to loss of net profits. A damage verdict may not be based upon speculation and guess work alone." Siegfried v. Kansas City Star Co., 298 F.2d 1 (8 Cir. 1962).[11] Here, it is apparent that the jury was persuaded to surmise that plaintiff, if unmolested, would take over a substantial portion of defendant's business of long standing. Such an inference must have evidentiary support.

The Bureau's other assignments of error relate to asserted trial errors that may well not recur. The judgment against the Bureau is vacated and the case is remanded for a new trial consistent with this opinion.

In the companion appeal, Terrell asserts that the trial court erred in granting a judgment notwithstanding the verdict in favor of the ten individual carriers.

11. We should note that plaintiff's cost figures as used in the projection, was based on his actual experience with his Texas guide. On the other hand, even assuming evidentiary support for the projected sales volume and frequency of issue, the projection would have still presented an improper premise to the jury for it assumed sales in the year 1962, while the Wyche letter, alleged to have been the causative factor in the loss, was not written until February, 1964.

During the period from 1961 (when Terrell first published his national mileage guide) until 1964, representatives from each carrier served with the Bureau in some capacity, either as an officer, on the Board of Directors, Rates and Tariff Committee, or Mileage Guide Subcommittee. Through a series of reports, activities of the Bureau were relayed to the carriers. There was some evidence that a few of the carriers' representatives met with Wyche after Rocky Ford Van Lines requested the transfer to the Oilfield Haulers guide and shortly before the "Wyche letter" was sent. Finally, the President of one of the carriers expressed some concern about the possibility of a competing guide.

However, after a careful reading of the record, we are convinced that there was no evidence which tied the carriers in with the arrangement between the Bureau and Rand McNally concerning the mileage guide, that any representatives of the carriers were involved in the Finance Center and D.T.M.S. incidents, or that the carriers knowingly participated in any conspiracy to restrain trade or monopolize the sale of mileage guides. The mere fact of their membership in the Bureau was insufficient to sustain a finding that they violated Sections 1 and 2 of the Sherman Act.

The judgment notwithstanding the verdict entered for the carriers is therefore affirmed.

COLEMAN, Circuit Judge (concurring in part and dissenting in part).

I concur in that part of the opinion of the majority which affirms the judgment notwithstanding the verdict rendered in favor of the carrier members of the Household Goods Carriers' Bureau.

I earnestly dissent from that portion of the opinion which vacates the judgment against the Bureau and remands the case for a new trial.

Upon an unusually extensive study of the record and briefs in this case I am thoroughly convinced that Terrell proved his case, and he should not be deprived of his verdict. To reverse a judgment for $1,125,000, rendered after a lengthy trial, is a serious matter. One cannot concur in such a result except upon the conviction that the law requires it—and I remain wholly unconvinced.

With deference to the views of my distinguished Colleagues, I do not fully comprehend the real basis upon which they have decided this case. The major point raised by the Household Carriers' Bureau is that its motions for directed verdicts and for judgment notwithstanding the verdict should have been sustained. The majority opinion does not address itself to this issue. It is left in something of a judicial never-never land. The Court does remand the case for a new trial, whereas if the appellant had been entitled to a directed verdict or to a judgment notwithstanding the verdict the judgment here would have been to reverse with directions that a judgment be entered for Household. If Terrell had not proved a case in the court below such a reversal with directions would, in my opinion, be mandatory. I suppose that these contentions are therefore subjected *sub silentio*. I would unequivocally decide the issue and would hold in plain and certain terms that Household was not entitled to either the directed verdict or to a judgment notwithstanding the verdict.

In the second place, I am unable to follow the reasoning of the Court as to the Wyche letter. The opinion holds that the letter was admissible in evidence but it later holds that the objection to the admission of the "false" parts of the letter should have been sustained. It was the publication of this letter and its distribution among members of the Oil Field Haulers Association and Rocky Ford Van Lines that caused a lack of confidence in Terrell and ultimately eliminated him as a Directory competitor. The letter was relevant to the purpose and intent of Wyche, acting for the Bureau, when he set about destroying competition from Terrell. Certainly, a more malignant purpose and intent is to be inferred when a writer stoops to falsehood instead of confining himself to the restraints of

truthfulness. Amazingly, the majority opinion emphasizes the argument of counsel with respect to this letter although that argument was not objected to in the court below, nor was it directly attacked on this appeal.

As a matter of fact, the appeal raised only four points: (1) That the trial court erred in its denial of Bureau motions for a directed verdict and a judgment notwithstanding the verdict, (2) That the verdict had no foundation in law, and, in any event, was clearly excessive, (3) That the trial judge made such prejudicial comments throughout the trial as to deprive the defendant of a fair trial; and (4) That certain of the Court's instructions to the jury amounted to reversible error. By and large, the case is decided outside the context of these assignments.

Not only did the trial court tell the jury, as the majority opinion indicates, that Terrell could not recover anything for libel but counsel stated as much in his oral argument. The jury could not have been misled on this point and it goes contrary to all appellate procedure to reverse a judgment because of an argument that was not objected to either below or here.

Under the proof in this case, I am of the opinion that the verdict of the jury should not have surprised anyone. Terrell showed the existence of the monopoly, the vigorous efforts of Household and Rand McNally to preserve that monopoly, that Terrell's Directory, so often on the verge of success, was destroyed by his competitors, and the monopoly remains intact, to the disadvantage of the shipping public.

Let me elaborate upon the evidence.

The defendant, Household Goods Carriers' Bureau, organized pursuant to the Reed-Bulwinkle and Interstate Commerce Commission Acts, is an organization of about 1,700 member carriers [of household goods] for whom the Bureau files a joint tariff with the Interstate Commerce Commission under § 5a of the Interstate Commerce Commission Act.

Each carrier was required to file a tariff with the ICC. To accomplish this, the members executed a power of attorney in favor of the Bureau. The Bureau also publishes for its members a *national mileage guide,* which is a tariff publication, containing maps and charts for the determination of highway distances between principal points in the United States. It is from these mileage tables that transportation charges are computed by all 1,700 carrier members of the Bureau.

Beginning in 1936, the Bureau has filed annually with the ICC a national mileage guide, which was and is compiled by Rand McNally. Until 1961, when Terrell began compiling his national guide, the Bureau and Rand McNally enjoyed a virtual monopoly in the field. The compilation and computations were done by Rand McNally, but the Bureau gave instructions as to those routes to be used in computing distances. For example, certain roads were omitted for purposes of mileage computations ["greened out"] but these roads nevertheless were actually used by the carriers in transporting goods. Since the guide was only a tariff publication and did not bind a carrier to take any particular route, the net effect often was that, by using the Bureau guide, the charge would be for a longer distance than the truckers actually traveled. The guide, of course, served the additional purpose of causing all carriers to use the same rate for transporting goods between any two given points.

The Bureau had an agreement with Rand McNally to purchase a minimum number of guides for sale to its members. (For Guide No. 7, the Bureau agreed to purchase 22,500 copies at $8.95). After the Bureau purchased the minimum number, they could purchase reprints at a discount—$6.20 per copy. These guides were a major source of revenue for the Bureau. In 1962, the Bureau received $257,000 from the sale of these guides.

In addition to the sales to the Bureau, Rand McNally was allowed to sell the mileage guides to any carrier or person

who wished to purchase them. Rand McNally agreed, however, that *other purchasers* would have to pay a price *higher than the Bureau paid.* In fact, the Bureau told Rand McNally that they were, under no circumstances, to sell the guides to an independent agency for less than $7.70 per copy—later raised to $9.75 by Rand McNally. By a second agreement, the Bureau would personally negotiate orders with agencies in New York and the Independent Movers and Warehousemen, and Rand McNally would deal with all others. These sales by Rand McNally were credited against the Bureau's minimum obligation.

In 1961, Terrell began compiling his national mileage guide. Prior thereto he had compiled a guide covering the State of Texas. That guide was used by the State and by irregular route common carriers in Texas to compute *intrastate* rate charges.

Terrell also had entered into an understanding with Rand McNally to compute mileages for them. Several of Rand McNally's employees visited Terrell in Texas and expressed interest in various systems he used for computation. During his association with Rand McNally, Terrell learned that the Bureau checked the maps and greened-out certain roads before the maps were sent to him. He was told that key points could not be added to the maps without the Bureau's permission.

Disagreement later arose between Rand McNally and Terrell (before completion of their agreement) and Rand McNally cancelled the order. (At trial, Rand McNally contended that the order was cancelled because Terrell's computations were highly inaccurate; Terrell claimed that Rand McNally failed to furnish him with the necessary maps).

While he was preparing his Texas guide and was working for Rand McNally, Terrell was constantly besieged by truckers who requested a new guide. He became convinced that there was a real need and demand for a competing guide. Since Rand McNally published its guide only every five to seven years, Terrell

hoped to attract new customers by publishing his guide more frequently.

So, in 1961, at the request of the Oil Field Haulers Association, another tariff agency, Terrell began computing his own national mileage guide, confident that a ready market existed. The Oil Field Haulers had formerly used the Rand McNally guide but became dissatisfied with it because it was not issued frequently enough and because of its "green-out" procedure. Terrell agreed to publish every two years a guide for the Oil Field Haulers Association. He testified that he made the agreement with the Association (knowing he would lose $17,000) because he was convinced that if one household carrier accepted it, he could sell 50,000 copies.

In his guide, Terrell used methods to compute mileages different from Rand McNally. For instance, since the Rand McNally guide was used primarily by truckers, it used the "green-out" method to delete from computation those roads unsuited for truck traffic. In his guide, Terrell used all weather roads in the state and federal highway systems, including parkways. He computed distances from several maps and if it was reliable used the shortest distance in his actual computation. Terrell also included in his guide a military tie-on section, which computed distances from military installations to other points. Taken together, Terrell's methods, frequently resulting in shorter distances between points than the Rand McNally guide, made his guide well suited for certain users, e. g., the government, in determining travel allowance for servicemen and in transporting household goods for military personnel.

Terrell completed the guide and had it filed with the Interstate Commerce Commission.

After publishing his new national guide, Terrell began an attempt to sell the guide to the United States Government for its use in transporting military personnel. He was referred to the government's Finance Center in Indianapolis, Indiana, and submitted a proposal to

them in July, 1963. Prior to this time officials of the Finance Center had used an Official Table of Distances in conjunction with the Rand McNally guide to compute distances.

After Terrell presented his proposal, Mr. Benjamin of the Finance Center made a preliminary evaluation and noted that the Rand McNally guide had nothing comparable to Terrell's military tie-on section. Thereafter, Benjamin conducted a thorough investigation on the relative merits of the two guides, visiting both Rand McNally's and Terrell's businesses. When he visited Rand McNally, one of its employees, Mr. Hermes, told Benjamin of prior experience with Terrell, stating that Terrell did not have a basic set of updated maps and that "any other approach to computing a mileage guide was invalid". Hermes further expressed the belief that Terrell had taken the Rand McNally guide and arbitrarily substracted distances from it for use in his own guide. Paradoxically, Hermes also told Benjamin that since the Rand McNally guide had "greened-out" routes which could be used by cars, it was not the one the Finance Center should be using. Nevertheless, he tried to convince Benjamin that Rand McNally could produce the guide he was looking for.

Following the investigation, Benjamin submitted his report. In it, he stated that on October 4, 1963, Rand McNally had furnished a report which contained "very critical comments concerning Mr. Terrell's ability to produce an accurate mileage table" and which stated that Terrell's table was little more than a "guesstimate" of actual mileages. Benjamin, however, disagreed with Rand McNally's appraisal of Terrell's guide and recommended that it be adopted. He found that by using Terrell's guide, *the government could save in excess of $5,-800,000 annually.*

During the period when Terrell sought acceptance of his guide by the Finance Center, Mr. Wyche, Executive Secretary of the Household Goods Carriers' Bureau, began receiving letters from carriers which were favorable to Terrell's guide. These letters expressed a desire that the Bureau adopt something similar to Terrell's military tie-on section. The carriers also began making inquiries about the excessive number of errors (estimated at 27,000 by Mr. Wyche) in the latest Rand McNally-Bureau guide.

In January, 1964, Rocky Ford Van Lines, a member of the Household Goods Carriers' Bureau, sought permission from Mr. Wyche to change from the Bureau's guide to Terrell's guide. Ford, like the Oil Field Haulers Association, was particularly dissatisfied with the "green-out" procedures used in the Bureau guide. After discussing the matter with several members of the Bureau's Board of Directors, Wyche responded to Rocky Ford by letter, making the following comments: (1) He was "amazed that the [Terrell] guide was ever permitted to be filed with the Commission [ICC] because of conflicting information contained therein"; (2) He felt that the distances used by Terrell in this guide were not independently computed but were obtained from the Bureau guide and then reduced five, ten, or fifteen miles (Wyche had actually made a comparison of only about 50–200 distances and had spent no more than an hour examining Terrell's guide); (3) He expressed doubt as to whether the distances used by Terrell could be computed scientifically or confirmed by existing highway routes; (4) He commented on the growing competition:

"We are quite concerned with respect to a competitive condition arising by, movers particularly, utilizing some other method of mileage determination that we get to a point with the moving industry wherein carrier's rates, by reducing mileages, will create utter confusion within the industry."

(5) He announced plans to file a complaint with the ICC and to request an investigation as to the methods used by Terrell; and (6) He urged Rocky Ford to reconsider its decision to change guides.

Despite Wyche's urgings, Rocky Ford Van Lines did not alter its decision, and

the Bureau, after being directed by the ICC as to the correct method for making the change over, complied with Rocky Ford's request. However, Howard Ford, the part owner of Rocky Ford Van Lines, became concerned with what Wyche said in reference to Terrell's guide. He called the Oil Field Haulers Association, read the letter to them, and sent a copy to them.

Wyche testified that he felt that as long as the Terrell guide was filed with the ICC, it constituted a "threat" to the Bureau. He was particularly concerned because Terrell's guide contained lower mileages, which could cause a competitive situation to develop. Wyche did not think such a situation would be permitted by the carriers. In the event of another guide, he felt the Bureau's Board of Directors would instruct the Bureau to file the identical guide or adjust rates to offset the differences with the competitive guide.

Carl D. Stoune, President of the defendant Central Forwarding, Inc., also expressed concern with the development of a competitive situation by the use of more than one mileage guide.

Rocky Ford's primary purpose for changing guides was to use it in competition for military household goods shipments. The Defense Department's long standing policy had been to ship by the approved carrier with the lowest overall cost. However, since all carriers used the Rand McNally guide, under various covers, the same rates were quoted, so the government used an "equitable distribution system", awarding shipments rateably to the various carriers.

By using Terrell's guide, however, Rocky Ford often quoted lower rates, thus giving the carrier reason to believe that it could gain a significant portion of the military business.

When the Transportation Officer at Fort Sam Houston, Texas, did not award shipments claimed by Rocky Ford, Terrell had a Member of Congress arrange a meeting with Defense Management Transit Service (D.T.M.S.). Mr.

Ford and Mr. Terrell's attorney, Mr. Babb, traveled to Washington, D. C. to confer with D.T.M.S., asking that Rocky Ford be allowed to claim those hauls in which it was the low cost carrier. Colonel Branigan, Director of Household Goods in D.T.M.S., was initially impressed with Mr. Ford's argument and implied that if Terrell's guide were accepted, other carriers would begin using it. The proposal was taken under advisement.

Meanwhile, representatives of Rand McNally wrote two United States Senators, complaining of political pressures used by Terrell to get D.T.M.S. to change guides. Both Senators wrote D.T.M.S., speaking favorably of Rand McNally.

While the Terrell proposal was under consideration, D.T.M.S. held a meeting on the subject at which Mr. Wyche was present. Wyche argued that the use of Terrell's guide would increase administrative costs by requiring the Transportation Officer to check both guides on each shipment to determine the low cost carrier. He also commented on the inaccuracies in the Terrell guide and expressed doubts about Terrell's ability to produce such a guide. In reply to Mr. Wyche's charge of higher administrative costs, Mr. Ford contended that it was the carrier who made the rate calculations and submitted them on a bill of lading to the Transportation Officer, who then only checked them. In any event, a particular route would have to be checked only once; thus minimizing any administrative costs.

D.T.M.S., without making actual cost studies, followed Wyche's suggestions and retained the "equitable distribution system".

About the time of the D.T.M.S. ruling, Terrell's attempt to get his guide accepted at the Finance Center suffered a similar fate when the Defense Department declined to follow the Finance Center's recommendation that Terrell's guide be used for computing military travel allowances.

After publication of the "Wyche letter" and its distribution to members of

the Oil Field Haulers Association, that Association called on Terrell to refute the accusations and criticisms made in the letter. Terrell testified that his relationship with the Association changed drastically after publication of the "Wyche letter". Mr. Boyd, Secretary of the Oil Field Haulers Association, testified that the letter was "the beginning of what now has developed into a full-blown picture of lack of trust and confidence [in Mr. Terrell]". Boyd was especially distressed about Wyche's threat of filing a complaint with the ICC.

Terrell met a second time with the Oil Field Haulers Association's Board of Directors. At this meeting, Terrell's earlier agreement with them was formalized, put into writing, and predated. In it, Terrell agreed to compute the guide for $20,000 per publication. Terrell prepared the maps and computations for the second guide and had them ready for the printer. The printer, however, was never given directions to proceed, and Terrell was never paid. Terrell also had a tentative agreement with the Association to compute a four state and eight state guide for $54,000. As with the national guide, this agreement did not reach fruition.

Thereafter, Mr. Hermes of Rand McNally met with members of the Oil Field Haulers Association's Board of Directors, at their request, to explore the possibility of Rand McNally preparing a guide for them. Members of the Committee expressed dissatisfaction with Terrell's using tenths of miles in this guide, making the computation too detailed. No agreement with Rand McNally was ever reached.

Following the series of disastrous setbacks in his attempt to sell his mileage guide, Terrell filed suit against the Bureau and its member carriers, charging it with libel in publication of the "Wyche letter". The trial resulted in a directed verdict in favor of the individual carriers and a hung jury with regard to the Bureau. After the trial, Terrell and the Bureau entered into a settlement for

$10,000, and the suit was dismissed with prejudice.

The plaintiff Terrell alleged that the Household Goods Carriers' Bureau combined and conspired with Rand McNally and Company to restrain trade and eliminate competition in the sale of national mileage guides in the United States, and illegally monopolized or attempted to monopolize the market for these guides.

Many factors must be considered in determining whether a particular agreement is an unreasonable restraint of trade in violation of § 1 of the Sherman Act. As Mr. Justice Brandeis ably stated:

> "[T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are relevant facts."

Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Other factors may also be considered: The percentage of the business controlled, the strength of the remaining competition, probable developments of the industry, and consumer demands, United States v. Columbia Steel Company, 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

Because of the difficulty of formalizing proof in an anti-trust action, circumstantial evidence plays a major role in

each case. In this instance, the statement of the Supreme Court in American Tobacco Company v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1945) becomes particularly relevant:

"The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in the exchange of words. (Citations omitted). Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified."

A conspiracy in restraint of trade under § 1 is not dependent on the doing of any overt act other than the act of conspiring, as a condition of liability, United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Leyvas v. United States, 9 Cir., 1967, 371 F.2d 714.

In this state of the law, applied to the recited evidence, I am of the positive opinion that the jury was justified by circumstantial and direct proof in finding that the appellant, Household Goods Carriers' Bureau, illegally conspired with Rand McNally to effectively suppress and destroy competition. See Eastman Kodak Company v. Southern Photo Materials Company, 273 U.S. 359, 375, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

Similarly, the jury could reasonably have found, as Terrell alleged, that the Bureau and Rand McNally monopolized this particular business in violation of § 2 of the Sherman Act.

There is no dispute about the existence of the monopoly. The question is its legality. To sustain a finding that the defendant engaged in an illegal monopoly, the plaintiff must prove that the defendant had both the power to monopolize— the power to control prices or exclude competition, United States v. E. I. DuPont De Nemours & Company, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) —and the intent to monopolize, United States v. Aluminum Company of America, 2 Cir., 1945, 148 F.2d 416. Once the monopoly power is acquired whether by legal or illegal means the use of that power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful", United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). I say that the existence of that power, and the use of that power, in this case shines with the brilliance of a locomotive headlight upon a wintry midnight.

There can be little doubt here that the Bureau activities deprived the public of the benefit of competitive prices in the shipment of household goods, resulted in injury to the public. Moreover, it is unreasonable *per se,* even in the absence of public injury, to foreclose a competitor from any substantial market. International Salt Company v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

Throughout the trial Terrell placed great emphasis on three particular events to establish anti-trust violations by the Bureau. Two of them may be taken together: The attempts by Terrell, at the Finance Center and at D.T.M.S., to obtain approval of his national mileage guide for government use. The Bureau correctly asserts that these incidents, in and of themselves, cannot be considered as evidence of violations of the Sherman Act. The contrary argument was finally disposed of by the Supreme Court in United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1964), when it held:

"Joint efforts to influence public officials do not violate the anti-trust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."

However, the appellant fails to note that the Court in *Pennington* also pointed that

"It would * * * still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis of the suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny. Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 46–47, 31 S.Ct. 502, 55 L.Ed. 619; United States v. Reading Company, 253 U.S. 26, 34–44, 40 S.Ct. 425, 64 L.Ed. 760.' F. T. C. v. Cement Institute, 333 U.S. 683, 798, 68 S.Ct. 793, 92 L.Ed. 1010."

Id. at 670–671, 85 S.Ct. at 1593–1594, footnote 3. Under the circumstances of the present case, it was not error for the trial judge to admit the evidence. He instructed the jury in a most careful and thorough manner that the Finance Center and D.T.M.S. incidents could not be considered as anti-trust violations. It must be presumed, then, that the jury followed the Court's instructions and considered them only as they related to the *purpose* and *character* of the transactions between the Bureau and Rand McNally.

It will be recalled that prior to the initiation of the anti-trust suit, Terrell sued the Bureau and its members, alleging that the "Wyche letter" was libelous. After the trial, which ended with the jury being unable to reach a verdict, Terrell entered into a settlement with the Bureau, and the suit was dismissed with prejudice with the following stipulation:

"That the cost of all depositions taken in this case shall be taxed in favor of the prevailing party or parties in Civil Action No. 1428, in the United States District Court for the Western District of Texas, Austin Division, styled John J. Terrell v. Household Goods Carriers' Bureau [the anti-trust suit] * * * "

Although this stipulation may not be regarded as a waiver *per se* of the defense of *res judicata,* it clearly indicates that parties thoroughly understood that the anti-trust action was to continue, else the stipulation would be an obvious nullity.

In addition, the Court below instructed the jury that they could not allow damages for any injury caused as a result of any *false* statements in the "Wyche letter".

Together with its claim that the verdict was without foundation, the Bureau contends that the verdict of $375,000 was excessive. I disagree. In a case such as this, it is impossible to determine damages with absolute certainty. As we have said, "Once the fact of injury is established, the jury has considerable leeway in assessing the amount of damages", Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir., 1967, 383 F.2d 97, 103, 106.

Both Terrell and an accountant testified that he spent in excess of $150,000 to compute and publish the guide. Terrell also testified that he knew he would lose money on the Oil Field Haulers Association contract, but could gain it back when he got a foothold in the market. He anticipated sales of 22,500 copies and publication every two years. This number, based on the amount purchased by the Bureau, was not clearly unreasonable. Colonel Branigan of D.T.M.S. expressed the opinion that if the Terrell guide were accepted by D.T.M.S., other carriers would change over to it. Mr. Wyche himself stated that if another guide existed which lowered charges, *the Bureau would be forced to file an identical guide.*

Of course, Terrell never received these benefits and the profits he anticipated were never realized. But had Terrell been permitted to compete and sell his 22,500 guides at $15 per copy, his gross profit would have been $337,500. In addition, Terrell had an agreement to publish a second national guide for the Oil Field Haulers Association for $20,000 and a tentative agreement to publish a four and eight state guide for $54,000. Because of the defendant's activities these agreements were never carried out.

On the basis of these facts, the verdict of $375,000 was not so clearly excessive as to justify appellate interference.

In view of the foregoing, I would unhesitatingly affirm the judgment of the District Court as to Household Goods Carriers' Bureau. From our failure to do so I respectfully dissent.