**HOUSEHOLD GOODS CARRIERS' BUREAU, Defendant-Appellant,**

v.

**John J. TERRELL, Plaintiff-Appellee.**

**John J. TERRELL, Plaintiff-Appellant,**

v.

**AERO MAYFLOWER TRANSIT CO., Inc., et al., Defendants-Appellees.**

**No. 25989.**

United States Court of Appeals, Fifth Circuit.

Nov. 22, 1971.

---

Coleman, Circuit Judge, concurred in part, dissented in part and filed an opinion in which Goldberg and Godbold, Circuit Judges, joined.

Ainsworth, Circuit Judge, concurred in part, dissented in part and filed an opinion in which Bell and Simpson, Circuit Judges joined.

Jones, Circuit Judge, dissented.

**154**

Melville C. Williams, Chicago, Ill., Hugh B. Cox, Washington, D. C., for defendant-appellant, Household Goods Carriers' Bureau.

Jack N. Price, Longview, Tex., Ivan R. Williams, Jr., Fred B. Werkenthin, Austin, Tex., for John J. Terrell.

Jay H. Brown, Austin, Tex., for Allied et al.

James W. Wilson, Austin, Tex., James L. Beattey, Indianapolis, Ind., for Aero Mayflower.

W. E. Cureton, Waco, Tex., F. Neil Aschemeyer, St. Louis, Mo., for United Van Lines.

Before JOHN R. BROWN, Chief Judge, and JONES, WISDOM, GEWIN, BELL, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK and INGRAHAM, Circuit Judges.*

---

* Judges Thornberry and Roney did not participate in the consideration of this case.

1. Household Goods Carriers' Bureau v. Terrell, 417 F.2d 47 (5th Cir. 1969). The

GEWIN, Circuit Judge:

Pursuant to Rule 35 of the Federal Rules of Appellate Procedure this private antitrust action was placed en banc by the Court. The original trial resulted in a jury verdict in favor of the plaintiff, John J. Terrell, and against the defendants, Household Goods Carriers' Bureau (hereinafter Household Goods or the Bureau) and ten individual carriers in the amount of $375,000 (trebled to $1,125,-000). The trial court entered judgment on the verdict against the Bureau but entered judgment notwithstanding the verdict in favor of the individual carriers. The majority of the panel that originally heard the case on appeal vacated the judgment against the Bureau and remanded the case for a new trial.[1] Upon rehearing en banc, the majority of this court is of the opinion that the judgment entered by the trial court against the Bureau should be affirmed on the issue of liability but reversed and remanded on the issue of damages. Since the intricate and voluminous facts of this case were fully developed in the majority and dissenting opinions of the original panel, we present only a skeletal outline.

I

Plaintiff-appellee Terrell developed and attempted to market a national "mileage guide" for use in quickly computing the highway mileage between over 775 "key points"—cities, towns, and military bases in the United States and Canada. A guide of this nature is commercially marketable for such commonplace but important computations as rates to be charged by freight haulers or movers of household goods; travel allowances to be paid to government, military, or civilian personnel by their respective employers; and moving allowances to be paid military families under orders to transfer. Prior to 1961, when

judgment n. o. v. in favor of the individual carriers is not before us. It was unanimously affirmed by the original panel and is not contested by either party on rehearing en banc.

Terrell first attempted to market his guide, all or substantially all, national mileage guides in use had been computed, manufactured and marketed by Rand McNally and Company[2] under an agreement with the defendant Bureau.

Household Goods Carriers' Bureau is a trade association and tariff bureau that represents some 1700 members, carriers of household goods; it is organized under the authority of the Reed-Bullwinkle Act[3] and approved by the Interstate Commerce Commission. Through power of attorney executed by each of its members it has authority to file a joint tariff with the Commission. The legality of this arrangement is not disputed. It is the agreement between the Bureau and Rand McNally that provides the foundation for Terrell's antitrust claim. By that agreement the Bureau obligated itself to purchase from Rand McNally a minimum number of 22,500 mileage guides at a fixed price; all guides in excess of the minimum were to be sold to the Bureau or to its members at a discount. In addition, Rand McNally agreed not to sell its guides to other purchasers at a price below the Bureau's discounted price. Many were sold at a higher price. A further agreement gave the Bureau the right to negotiate personally with certain other agencies and reserved to Rand McNally the right to deal with all others. Finally, the Bureau was accorded controlling influence in determining the scope and content of the Rand McNally guides.

Although the Rand McNally guide was the only one on the market, it was noticeably inadequate for many of the purposes for which it was used. A combination of factors caused the guide to show longer than necessary distances between key points.[4] There was evidence to the effect that members of the Bureau and other motor carriers accepted and even encouraged these overstatements because their transportation charges were computed from the guide's mileage tables. On the other hand, many agencies that pay employees or carriers for travel on a per mile basis showed a preference for a more current guide that reflected the shortest possible reliable distances. In addition, the close relationship between the Bureau and Rand McNally gave the Bureau a degree of control over other elements of the guide, including the designation of "key points." Agencies that made computations involving non-listed points were thus put to the time and expense of making extra computations. A noticeable omission in this regard was the failure of the Bureau guide to provide a convenient means of calculating distances between military bases.

To fill this marked competitive gap came Mr. Terrell with a guide designed to meet the needs of the Bureau's unsatisfied customers. In computing his guide, Terrell included all major roads accessible by automobile. He planned to recompute a new guide every two years from the most recent maps available. In computing all of his distances, he used the shortest reliable figures available; and his guide included a ready means of including over 400 military bases in the computations.

Plaintiff began selling his product in 1961, and found a willing customer in the Oilfield Haulers' Association, a 500

---

2. Plaintiffs named Rand McNally as a co-conspirator but did not join them as defendants.

3. 49 U.S.C.A. § 5b.

4. Rand McNally issued a revised guide only every six or seven years; consequently, it failed to reflect the large number of changes in routings and openings of new highways that occurred in the intervening years. The vast majority of these improvements in the highway systems resulted in shortened distances between key points. In addition, distances in the Rand McNally guide were computed only along highways suitable for heavy truck traffic, so a large number of the computations arbitrarily excluded shorter travel routes accessible to automobiles and lighter trucks. As a result of these and other less significant factors, there were said to be some 27,000 inaccuracies in the Rand McNally guide, most of which tended to overstate the distance between points.

member trade association and tariff bureau whose members transported oilfield machinery. Continued solicitation yielded substantial interest and a highly favorable report from the Finance Center of the U. S. Department of Defense (Finance Center),[5] despite efforts by defendants to discredit the guide. Early in 1964, plaintiff convinced Rocky Ford Van Lines (Rocky Ford), a Household Goods affiliate, to withdraw from the Bureau and affiliate with the Oilfield Haulers. By using the different and generally lower mileages reflected in the Oilfield Haulers' guide, Rocky Ford sought to introduce competitive rates among the Household Goods haulers.

Accordingly, Rocky Ford began the transfer procedure by informing Household Goods of its desire. The Bureau responded with the "Wyche letter"—a strongly worded letter questioning the accuracy of Terrell's guide, threatening a complaint to the ICC, and stressing the undesirable competitive effects on the industry that would flow from the adoption of a competitive guide. The contents of the letter were passed on to the Oilfield Haulers' Association. Shortly after becoming aware of this letter, plaintiff filed this suit and a related libel suit. The libel suit, which was settled by consent decree, is the basis of a defense of res judicata raised by the Bureau on this appeal. Despite the letter, Rocky Ford consummated its changeover to the Terrell guide; and the Oilfield Haulers signed a contract for a revised guide early in 1964. Terrell and Rocky Ford then began a joint effort to convince the Defense Traffic Management Service (DTMS), the gov-ernment agency which controls the shipment of household goods for military personnel,[6] to accept and act on competitive bids computed from Terrell's guide.

At this stage, Terrell's prospects seemed excellent. He had one tariff bureau as an established customer; the Finance Center had responded favorably to his overtures; and, most importantly, he had an inroad to the influential Household Goods Carriers' Bureau. He was cultivating an ambitious expectation that competitive necessity would require the Bureau's members to accept a guide like his once the impact of Rocky Ford's competition was felt. On the other hand, the Bureau, although nominally only a tariff bureau, had identifiable interests in limiting plaintiff's access to the market. First, as representative and spokesman for its 1700 members, the Bureau was concerned that plaintiff's shorter mileages would bring competition and reduced profits for its members.[7] Secondly, the Bureau itself derived a substantial income through its arrangement with Rand McNally for distribution of the guides.[8]

Shortly after circulation of the Wyche letter, plaintiff's rosy future began to blacken. The Finance Center, with some prodding from the Bureau, reversed its position and decided not to adopt plaintiff's guide. A large scale battle for influence before the DTMS allegedly resulted in a full blown picture of lack of trust and confidence in Mr. Terrell; ultimately, DTMS, working in connection with the Bureau and the Finance Center, refused to interpret the regulation in Mr. Terrell's favor. The Oilfield

---

5. This agency had the authority to adopt Mr. Terrell's guide for use in calculating government per diem travel and transportation allowances.

6. Because all rates quoted from the Rand McNally guide were uniform, DTMS used a system of "equitable allocation" whereby qualified carriers were awarded government business on a rotating basis. Rocky Ford sought reinstatement of a system of competitive bidding, based on a government regulation specifying that:

Only the carriers who provide high-quality service at the lowest overall cost to the Government will be used. Defense Supply Agency Regulation 4500.1 (Plaintiff's Exhibit 19).

7. The record shows that in 1960, 95% of the members of the Bureau charged uniform rates.

8. The Bureau considered receipts from the mileage guide to be important in supplementing its dues. Gross receipts from the guide in 1960 were $87,000. Net revenue was about $50,000.

Haulers defaulted on their contract and began using the Bureau's guide. Frustrated in its attempts to gain competitive advantage in its services for DTMS, Rocky Ford returned to using the Bureau guide. Mr. Terrell was eliminated from competition. The jury found the elimination unlawful and measured the injury to Mr. Terrell in the amount of $375,000.

## II

### A. *The Wyche Letter*

At trial and on the original appeal, appellants took the position that the Wyche letter was inadmissible in its entirety because it had been the subject of litigation in the previously settled libel suit and, therefore, under the doctrine of *res judicata,* was not a proper subject of litigation in a second suit. We cannot accept this contention. The majority of the original panel concluded that subject to the limitations mentioned in the opinion, the letter was indeed admissible in evidence in the antitrust suit.[9] Moreover, it is well established that in a proper case one wrongful act may be the subject of two or more separate and distinct causes of action.[10] In the instant case, for example, the letter plainly represented the invasion of two separate and distinct primary rights, the one a personal right not to be subjected to libelous statements, and the other a business right to enter competition freely.[11] Thus, we conclude that the letter and its libelous nature were properly admitted to show an intention or a scheme to restrain trade, the prior libel suit notwithstanding.

Appellants vigorously assert, however, that the court committed prejudicial error in failing to exclude the allegedly libelous portions of the letter and in failing to impress upon the jury that damages could not be awarded for any injury growing out of the libel.[12] We agree in part. The original majority found reversible error because the *entire* letter went to the jury as evidence without adequate limiting instructions and after undue emphasis by plaintiff's attorney on its allegedly libelous portions. In our opinion plaintiff's attorney's emphasis on the known falsity of the letter, while entirely proper on the issue of defendants' intent to exclude competition unlawfully, implicitly invited the jury to award damages for the libel. Moreover, we are in agreement with the original majority in their conclusion that the trial court's limiting instruction was not sufficient to alleviate this very real

9. "Thus, while the letter was admissible evidence in the antitrust suit, there was present the inherent danger that the antitrust suit would include what, in substance, was a re-trial of the libel case." 417 F.2d at 51 (majority opinion).

10. Bankers Trust Co. v. Pacific Employers Ins. Co., 282 F.2d 106 (9th Cir. 1960); Atherton v. Anderson, 86 F.2d 518 (6th Cir. 1936); United States v. Pan American Petroleum Co., 55 F.2d 753 (9th Cir.), cert. den. 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532 (1932).

11. Appellants rely on Nalle v. Oyster, 230 U.S. 165, 33 S.Ct. 1043, 57 L.Ed. 1439 (1913); Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 295 F.2d 362 (5th Cir. 1961); Engelhardt's Camera Store v. Bell & Howell Co., 327 F.2d 30, 33–34 (8th Cir. 1954); Williamson v. Columbia Gas & Electric Corp., 186 F.2d 464, 465–468 (3d Cir.), cert. den. 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1950);

F. L. Mendez & Co. v. General Motors Corp., 161 F.2d 695 (7th Cir.), cert. den. 332 U.S. 810, 68 S.Ct. 111, 92 L.Ed. 387 (1947). These cases held that res judicata barred plaintiffs from bringing a second suit based on the same "cause of action" as an earlier suit. In each of those cases plaintiffs were complaining of an invasion of the same right in both suits. Our conclusion in this case that the libel suit and the antitrust suit involve an invasion of two separate and distinct primary rights makes the cited cases inapplicable because a separate cause of action is involved in this suit.

12. Plaintiffs argue for the first time on rehearing that defendants did not properly preserve an objection to admission of the allegedly libelous portions of the Wyche letter. Although we disagree, discussion is not necessary in light of our holding that the letter was admissible in its entirety.

danger that the jury would apply an improper measure of damages.[13]

### B. *The DTMS Finance and Center Incidents*

In an attempt to comply with the teaching of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.[14] and United Mine Workers v. Pennington,[15] the trial court issued a pre-trial order declaring that:

> Plaintiff [Terrell] cannot recover any damages for any injury or damage which was caused or alleged to have been caused by any action of the Finance Center, DTMS, or any other agency of the United States of America. . . .

The order also prohibited counsel for plaintiff from referring without the court's prior consent to any of the dealings between plaintiff or defendants and either of the two government agencies involved. Nonetheless, a flood of evidence tending to show attempts by both parties to influence the respective government agencies was offered with the court's approval after defendants put into evidence a memorandum by the U. S. Army Chief of Finance.[16] The memorandum made numerous accusations to the effect that plaintiff had been "extremely aggressive" and had "generally misrepresented the facts" in attempting to influence the Defense Department to accept his guide. All of this evidence was properly admissible in the court's discretion to show the "purpose and character of the transaction under scrutiny",[17] to rebut the insinuations put into evidence by the defendants, and to prove the existence of a conspiracy between the Bureau and Rand McNally. By the terms of the lower court's pre-trial order, however, plaintiffs may not recover any damages for business lost as a result of attempts to influence government officials.[18]

---

13. "In the instant case, the danger became reality; the 'false' portions of the Wyche letter were directly and vigorously asserted as a ground for relief in the antitrust suit to such a degree that it cannot be said that the rights created by the dismissal of the libel case were not materially prejudiced." 417 F.2d at 51.
Thus, we agree with the original panel majority that the case has been mishandled and disagree only as to the scope of the prejudice growing out of the mishandling.

14. 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

15. 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965). *Noerr* holds that joint "solicitation of governmental action with respect to the passage and enforcement of laws" cannot be violative of the Sherman Act unless the solicitation "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor. . . ." 365 U.S. at 144, 81 S.Ct. at 533. *Pennington* adds that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." 381 U.S. at 670, 85 S.Ct. at 1593.

16. Earlier, on the second day of trial, the court allowed plaintiff to place in evidence a government report recommending his guide. (Record at 372–374. See 417 F.2d at 52.)

17. United Mine Workers v. Pennington, 381 U.S. 657, 670–671 n. 3, 85 S.Ct. 1585, 14 L.Ed.2d 626; Household Goods Carriers' Bureau v. Terrell, 417 F.2d 47, 61 (5th Cir. 1969) (dissenting opinion).

18. In this appeal Terrell has properly argued in support of the judgment below that the court was correct in admitting evidence of the DTMS and Finance Center incidents as circumstantial proof of the purpose and character of the actions of the Bureau and Rand McNally. See Dandridge v. Williams, 397 U.S. 471, 475, 90 S.Ct. 1153, 25 L.Ed.2d 491, 496 n.6 (1970). However Terrell also contends that the trial court erred in refusing to permit recovery of damages for these incidents. Such an argument is not in support of the judgment, but is an effort to expand the basis of the judgment to include an element of damage specifically eliminated by the court below. Terrell failed to make or preserve any objection to the court's pre-trial order or the jury instructions which eliminated this element of damage from the lawsuit. His acquiescence at trial coupled with his failure to take a cross appeal on the point preclude his present attack on the court's judgment.

From our examination of the record, we are critically aware of the absence of emphasis throughout the trial on the important distinction that we have articulated above. Although both sides took pains to argue thoroughly the facts of the alleged attempts to influence, the court and attorneys made only fleeting reference to the limitation imposed by the court's pre-trial order. There was no limiting instruction given upon introduction of the evidence and only a brief paragraph in the court's instruction to the jury cautioning that:

> Plaintiff cannot recover and you will not allow any damages in this case for any injury or damages which was caused, or is alleged to have been caused, by any action of the Finance Center, Defense Transportation Management Service, or any other agency of the United States of America.

In light of the voluminous testimony heard by the jury, we do not think that the above quoted instructions were sufficient to overcome the substantial likelihood that the jury would, and in fact did, award damages for the loss of the government business.

## C. *Proof of Damages*

To prove his damages, plaintiff sought to show by expert testimony the profits lost on account of defendants' unlawful conduct between 1962 and the year of the trial—1968. In doing so the expert assumed that plaintiff would have sold 22,500 copies of his guide every two years at $15.00 per copy; he arrived at a projected gross income of $1,350,000 for the years 1962–1968 inclusive. From this figure he deducted his projected biannual expenses to reflect an anticipated profit of $880,000. The procedure followed is acceptable provided each element of the projection is supported by proven facts. Although generally lenient in allowing damages in antitrust matters,[19] courts must not permit a damage verdict to be based on speculation.[20]

In this case, plaintiff relies on Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.,[21] as justification for adopting as its projected sales volume per edition the minimum number of guides to be purchased by the Bureau as specified in the most recent agreement between Rand McNally and the Bureau. We conclude, as did the original majority, that *Cherokee* is inapposite here. In that case, the plaintiff's participation in the market prior to defendant's illegal activities was a special circumstance justifying an inference that "but for" the defendant's illegal activities, plaintiffs would have been in the same position in the market as defendants. In this case, there was proven no special set of circumstances to make valid a similar "but for" proposition. To assume that plain-

But in any case, considering the totality of the facts and circumstances disclosed by the record, Terrell has not brought himself within the ambit of the recent cases interpreting the *Noerr-Pennington* doctrine which appear to indicate that joint efforts by parties who, for anticompetitive purposes, seek to undermine, subvert, or circumvent the efficacy of established governmental policies are not necessarily immunized from prosecution under the Sherman Act. See, e. g., Woods Exploration & Producing Co. v. Aluminum Company of America, 438 F.2d 1286 (5th Cir. 1971); Trucking Unlimited v. California Motor Transport, 432 F.2d 755 (9th Cir. 1970); Whitten v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970); cf. Continental Ore Co. v. Union Carbide and Carbon Co., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). But cf. Gaslight Co. of Columbus v. Georgia Power Co., 440 F.2d 1135 (5th Cir. 1971). See generally Costilo, Antitrust's Newest Quagmire: the Noerr-Pennington Defense, 66 Mich.L.Rev. 333 (1967); Note, Application of the Sherman Act to Attempts to Influence Governmental Action, 81 Harv.L.Rev. 847 (1968).

19. Bigelow v. RKO Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); North Texas Producers Assn. v. Young, 308 F.2d 235 (5th Cir. 1962).

20. Id.; Harrison v. Prather, 435 F.2d 1168 (5th Cir. 1970) [December 16, 1970]; Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962); Siegfried v. Kansas City Star Co., 298 F.2d 1 (8th Cir. 1968).

21. 383 F.2d 97 (5th Cir. 1967).

tiff could fully penetrate the Bureau's market is pure speculation and requires the further and totally unsubstantiated assumption that the Bureau would not take competitive steps by revising its own guide or sponsoring a general reduction of rates by its members.

■ In light of the considerations discussed in this portion of our opinion (Part II) and after an independent examination of the evidence of injury offered by plaintiff, we are of the firm conviction that the record does not reflect evidence properly submitted to the jury that is sufficient to support the sizeable verdict here involved.

> Proof essential to recovery of damages in antitrust litigation has been the subject of many Clayton Act claims. . . . The rule thereby established may be summed up thus: The fact of damages, as well as the amount thereof, is entirely a question of sufficiency of evidence. In every case, the question is whether the data of which the evidence consists is such that a just and reasonable inference and estimate thereof can reasonably be drawn from the evidence so that a verdict will not be based on mere speculation or guesswork.[22]

Although we may not ordinarily substitute our judgment for that of the jury, we are required to exercise that judgment in determining whether it is likely that the jury was actually swayed by considerations not properly before it. In fairness to both parties we do not think that the jury could reasonably have arrived at a verdict of $375,000 unless it was influenced by one or more of the above discussed improper considerations. A retrial of the damages issue is therefore necessary. We reverse the judgment of the district court insofar as it affirms the jury's award of damages and remand only on the issue of damages.

### III

We do not deem it necessary to require a retrial on the issue of defendant's liability. On this question we agree with the original dissent that there is ample evidence to support a finding by the jury that the Sherman Act has been violated.

> Terrell showed the existence of the monopoly, the vigorous efforts of Household and Rand McNally to preserve that monopoly, that Terrell's directory, so often on the verge of success, was destroyed by his competitors and the monopoly remains intact to the disadvantage of the shipping public.[23]

The evidence of the record convinces us that the Bureau could be found guilty either of conspiracy in restraint of trade in violation of § 1, of the Sherman Act[24] or of monopolization in violation of § 2.[25]

■ The Federal Rules of Civil Procedure are liberal in favoring the admissibility of evidence if there is any theory justifying its admission, and the trial judge is given broad discretion in making this determination.[26] The jury

22. National Wrestling Alliance v. Myers, 325 F.2d 768, 777 (8th Cir. 1963).

23. 417 F.2d at 55 (dissenting opinion).

24. See, e. g., United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Fashion Originators Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L. Ed. 949 (1941); United States v. Standard Oil Co., 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1909).

25. See, e. g., United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); United States v. Aluminum Company of America, 148 F.2d 416 (2d Cir. 1945).

26. Fed.R.Civ.P. 43(a). The rule has been interpreted liberally in light of the modern trend to allow the admission of any reliable evidence which tends to throw light on the circumstances surrounding the controversy. 2B Barron & Holtzoff, Federal Practice & Procedure § 962 (Wright Ed. 1961); see also Harrison v. Prather, 435 F.2d 1168, at 1174 (5th

heard no evidence that it was not entitled to hear on this issue. *Res judicata* does not make the Wyche letter inadmissible in this antitrust action. Evidence relating to the transactions with the government are admissible under *Pennington* to show the "purpose and character" of the Bureau's dealings in non-governmental transactions.[27] The district court's judgment on the issue of liability is affirmed.

Affirmed in part; reversed in part, and remanded for further proceedings not inconsistent with this opinion.

COLEMAN, Circuit Judge, with whom GOLDBERG and GODBOLD, Circuit Judges, join, concurring in part and dissenting in part.

I concur in that portion of the opinion of the Court which affirms the judgment below as to the liability of the appellant.

As to the remand for a new trial on the issue of damages, I respectfully dissent. The reasons were originally set forth in my dissent to the panel decision, 417 F.2d 61, 62, as follows:

"Together with its claim that the verdict was without foundation, the Bureau contends that the verdict of $375,000 was excessive. I disagree. In a case such as this, it is impossible to determine damages with absolute certainty. As we have said, 'Once the fact of injury is established, the jury has considerable leeway in assessing the amount of damages', Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir., 1967, 383 F.2d 97, 103, 106.

"Both Terrell and an accountant testified that he spent in excess of $150,000 to compute and publish the guide. Terrell also testified that he knew he would lose money on the Oil Field Haulers Association contract, but could gain it back when he got a foothold in the market. He anticipated sales of 22,500 copies and publication every two years. This number, based on the amount purchased by the Bureau, was not clearly unreasonable. Colonel Branigan of D.T.M.S. expressed the opinion that if the Terrell guide were accepted by D.T.M.S., other carriers would change over to it. Mr. Wyche himself stated that if another guide existed which lowered charges, *the Bureau would be forced to file an identical guide.*

"Of course, Terrell never received these benefits and the profits he anticipated were never realized. But had Terrell been permitted to compete and sell his 22,500 guides at $15 per copy, his gross profit would have been $337,500. In addition, Terrell had an agreement to publish a second national guide for the Oil Field Haulers Association for $20,000 and a tentative agreement to publish a four and eight state guide for $54,000. Because of the defendant's activities these agreements were never carried out.

"On the basis of these facts, the verdict of $375,000 was not so clearly excessive as to justify appellate interference.

"In view of the foregoing, I would unhesitatingly affirm the judgment of the District Court as to Household Goods Carriers' Bureau. From our failure to do so I respectfully dissent."

AINSWORTH, Circuit Judge, with whom BELL and SIMPSON, Circuit Judges, join, concurring in part and dissenting in part:

I respectfully dissent from the majority opinion which affirms the judgment below against the Bureau on the

Cir. 1970) [Dec. 16, 1970]; Butler v. Southern Pacific Co., 431 F.2d 77 (5th Cir. 1970) [August 24, 1970]; Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir. 1961); Mon-

arch Ins. Co. v. Spach, 281 F.2d 401 (5th Cir. 1960).

27. Other technical points raised by the appellants do not rise to the level of harmful error, and we reject them without further discussion.

**162**

issue of liability and remands for retrial only on the issue of damages. I concur, however, in the remand on the damages issue.

The question of the Bureau's liability was not fairly tried before the jury below, and because of prejudicial errors at the trial, a full and complete retrial should be ordered. A review of the proceedings shows that at the heart of plaintiff's case is the Wyche letter with its allegedly libelous statements against Terrell. The letter was admitted in evidence, over objection, though the Bureau had previously paid $10,000 to Terrell to settle the libel suit based on the letter. Settlement of the libel suit should have ended the Wyche letter question. Otherwise, Terrell would be allowed to maintain two actions, libel and antitrust, out of the same letter. Cf., e. g., Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 5 Cir., 1961, 295 F.2d 362. Further, he was permitted improperly to use the so-called libelous portions of the letter as the central evidence of overt acts in his antitrust suit. No limiting or cautionary instruction was given by the Court when the evidence was received. The majority opinion holds that the Wyche letter was properly received in evidence, yet concedes the harm to the Bureau's case which resulted from its use, especially in the closing argument of plaintiff's counsel to the jury. As the majority puts it, "In our opinion plaintiff's attorney's emphasis on the known falsity of the letter, while entirely proper on the issue of defendants' intent to exclude competition unlawfully, implicitly invited the jury to award damages for the libel."[1] The Trial Court's one-sentence admonition to the jury in its lengthy charge that no damages should be awarded for the statements in the Wyche letter, was hardly adequate to offset the harm, as the ma-

jority agrees in its opinion when it states, "Moreover, we are in agreement with the original majority in their conclusion that the trial court's limiting instruction was not sufficient to alleviate this very real danger that the jury would apply an improper measure of damages."

Prejudicial error which flowed from improper use of the Wyche letter requires a new trial, not only on the measure of damages, but especially as to liability itself. It is extremely doubtful that the jury would have held that the Bureau was liable except for the harmful and prejudicial use of the Wyche letter. The distinction is too fine to comprehend that the letter was prejudicial only in that the jury was allowed to apply an improper measure of damages, but not also prejudicial on the question of liability itself. A lay jury certainly should not be expected to understand a distinction that subtle.

Improper use of the Wyche letter in itself is sufficient to warrant a new trial on all issues, but when compounded with what the majority terms "a flood of evidence tending to show attempts by both parties to influence the respective government agencies," the prejudicial effect becomes much greater and it is even more apparent that the Bureau did not receive a fair trial below. The Trial Court applied the Noerr-Pennington rule (Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965)) when he stated in his pretrial order that plaintiff could not recover any damages as a result of any action of the Finance Center, DTMS, or any other agency of the United States, and further in prohibiting counsel for plaintiff from referring without the Court's prior consent to any of the deal-

1. The defendant Bureau points out in its brief on rehearing en banc that the Wyche letter was read in full to the jury and plaintiff Terrell testified to statements in the letter which he declared were false. In his final address plaintiff's counsel said the letter "was vicious," "was untrue," and "was calculated." This demonstrates quite clearly the serious prejudicial effect which results from admitting this evidence even for the so-called "limited" purpose.

ings between the parties and the two government agencies involved. Despite the order of the Court, the case was inundated by "a flood of evidence" properly admitted according to the majority, to show the "purpose and character of the transaction under scrutiny" in accordance with a phrase taken from a footnote in the *Pennington* decision. *Pennington,* supra, 381 U.S. at 670–71 n. 3, 85 S.Ct. at 1593. But according to the *Pennington* note the Trial Judge should admit this evidence "if he deemed it probative and *not unduly prejudicial."* (Emphasis supplied.)

Under the circumstances the footnoted observation in the majority opinion (n. 13) is both interesting and informative. The majority states, "Thus, we agree with the original panel majority that the case has been mishandled and disagree only as to the scope of the prejudice growing out of the mishandling."

The evidence relating to efforts of the parties to influence government agencies is inadmissible in view of the Noerr-Pennington rule that such activities are exempt from the provisions of the Sherman Act. Once this evidence was admitted—contrary to the Trial Judge's pretrial order—the Court's subsequent brief charge to the jury that damages cannot be allowed for any activities relating to governmental agencies obviously does not cure its prejudicial effect. Since, as the majority points out, "There was no limiting instruction given upon introduction of the evidence . . ." the prejudice is even greater. The original panel majority opinion is quite explicit in regard to the admissibility of evidence. It states in pertinent part (417 F.2d 47, 52), "This is not a situation where the evidence might be regarded as cumulative; quite the contrary, the danger here is that the 'purpose and character' evidence will receive such force and weight so as to preclude a fair verdict on the substantive basis of the claim." (Footnotes omitted.) It is difficult to understand, as with the Wyche letter, how this detrimental and prejudicial evidence can be received but,

nevertheless, how its effect can later be dissipated by cautionary instructions to the jury. This requires more of a jury than we have a right to expect.

A fair verdict was not possible under the circumstances which prevailed in the trial of this case. Justice between the parties would best be assured by retrial of the entire matter, as was ordered by the original panel decision herein. Since, however, a majority of the en banc court has determined that the judgment as to liability should be affirmed, I have concluded to join in the remand on the issue of damages only, while reiterating my dissent on the liability question.

JONES, Circuit Judge (dissenting):

I believe the decision of the panel of this Court is right and the opinion of Judge Choate is sound. I dissent from the action of the Court en banc.