The COW PALACE, LTD., a Washington Corporation, and the Dolsen Company, a Washington Corporation, Plaintiffs,

v.

ASSOCIATED MILK PRODUCERS, INC., a corporation, Defendant.

Civ. A. 74–A–836.

United States District Court, D. Colorado.

Feb. 10, 1975.

Dawson, Nagel, Sherman & Howard by Hugh A. Burns and William E. Walters, Denver, Colo., for plaintiffs.

Arent, Fox, Kintner, Plotkin & Kahn by Sidney Harris, Washington, D. C., and Roath & Brega by Gerald Raskin, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

This is a private antitrust action in which plaintiffs allege a conspiracy in restraint of trade, prohibited by section 1 of the Sherman Act. [15 U.S.C. § 1] Jurisdiction is asserted under section 4 of the Clayton Act. [15 U.S.C. § 15] Both plaintiffs are Washington state corporations; one, The Cow Palace, Ltd., produces and markets fluid milk and milk products; the other, The Dolsen Company, is in the business of leasing cows to milk producers. Defendant

Associated Milk Producers, Inc. [hereinafter referred to as AMPI] is an "agricultural cooperative marketing association" as authorized by 7 U.S.C. § 291. AMPI is comprised of approximately 40,000 milk producers located in fifteen mid- and southwestern states, including Colorado.

The Complaint alleges that known and unknown agents and members of AMPI conspired with representatives of the United States government to "influence the minimum price paid under milk marketing orders." [1] Specifically, plaintiffs charge (1) that from 1968 until 1971, defendant made illegal campaign contributions and paid bribes to representatives of the United States government; (2) that when these activities surfaced in the national media, amid related and unrelated scandals, the question of minimum milk prices was rendered politically sensitive; and (3) that as a result, the "Secretary of Agriculture and his agent, the Federal Milk Market Administrator, have refused to . . . increase the minimum price paid for milk . . . ." The minimum price has allegedly been frozen at the same level since 1971. In light of substantial increases in production costs during this period, many smaller independent milk producers no longer can effectively compete with larger cooperatives like AMPI. Plaintiffs claim personal damage to their businesses and property as a result of defendant's "anticompetitive behavior." They seek a permanent injunction restraining AMPI from such conduct in the future as well as actual damages in the amount of 3.5 million dollars to be trebled to 10.5 million dollars.

The matter is before us on defendant's motion to dismiss the Complaint for failure to state a claim upon which relief may be granted. [Fed.R.Civ.P. 12(b)(6)] After extensive briefs and oral argument, the motion is ripe for disposition. Defendant's primary contention is that its conduct, as alleged in the Complaint, is "exempt" from the Sherman Act by virtue of the so-called *Noerr-Pennington* doctrine. We agree that this doctrine governs resolution of the instant *motion*. However, AMPI also offers arguments of statutory exemption from the antitrust laws, failure to exhaust administrative remedies, "primary jurisdiction," and plaintiffs' lack of standing. We will dispose of these contentions before turning to the central issue of the *Noerr-Pennington* doctrine.

In the Agricultural Adjustment Act [specifically, 7 U.S.C. § 608b], there is provided a limited form of antitrust immunity. Section 608b immunizes agricultural marketing agreements from the operation of antitrust laws, but this provision has no application to the present controversy. The Secretary of Agriculture is authorized to enter into marketing agreements with producers and processors, and such *agreements* will not be invalidated because they may have anticompetitive effects. [*See, e. g.,* Bramsen v. Hardin, 346 F.Supp. 934 (S.D.Fla.1972), aff'd, Chiglades Farm, Inc. v. Butz, 485 F.2d 1125 (5th Cir. 1973), cert. denied, 417 U.S. 968, 94 S. Ct. 3170, 41 L.Ed.2d 1138 (1974)] But it has long been recognized that the marketing of agricultural products is not *per se* immune from the Sherman Act. [*See, e. g.,* Maryland & Virginia Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L. Ed.2d 880 (1960); United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939)] Indeed, this same defendant raised the same statutory exemption argument in Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 380 F.Supp. 880 (W.D.Mo. 1974). The court explicitly held that the § 608b exemption was limited to the

---

1. The nature of the "trade or commerce" which defendant's alleged antitrust violation affected and the pricing mechanism by which the alleged conspiracy injured plaintiffs may be generally understood by reference to the statutory and regulatory framework of agricultural marketing. [*See,* 7 U.S.C. § 601 et seq.; *see especially,* 7 U.S.C. §§ 608c(18) and (19); *see also,* 7 C.R.F. pts. 900 and 1000]

"making of marketing agreements," and was irrelevant to alleged antitrust violations relating to federal marketing orders under § 608c. We agree with this conclusion. [*See also,* Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F.Supp. 1019 (S.D.Tex. 1972)] Moreover, it is the marketing agreements, and not *all* conduct in relation to such agreements, which is exempt from the operation of antitrust laws.

■ ■ The defendant's second argument, namely that plaintiffs should seek administrative relief pursuant to 7 U.S. C. § 608c(15) has no bearing on this case. Plaintiffs have not sued the Secretary of Agriculture or any of his agents. Nor is this an action to correct errors in the administrative process which governs minimum milk prices; rather, plaintiffs seek compensation for, and injunctive relief from, defendant's alleged anticompetitive conduct. Thus, no exhaustion of administrative remedies is required. Additionally, there is no indication that Congress intended to vest in the Department of Agriculture plenary authority to regulate anticompetitive behavior of agricultural producers. We conclude, then, that no issue of primary jurisdiction is presented. [*See,* Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 380 F.Supp. 880, 887–88 (W.D.Mo.1974); *cf.,* Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); McLeran v. El Paso Natural Gas Co., 357 F.Supp. 329 (S.D.Tex.1972)]

■ AMPI also maintains that plaintiffs lack standing under section 4 of the Clayton Act to bring this action. Despite the exhaustive arguments of counsel, we are unable to ascertain from the Complaint whether plaintiffs have standing under either the "direct injury" or "target area" theories. This failure of the Complaint, however, would not, in and of itself, subject plaintiffs to dismissal of their claims. Instead, the court would order plaintiffs to submit a "more definite statement," as provided by Fed.R.Civ.P. 12(e). This is a permissible order in response to a Rule 12(b) motion, and is particularly appropriate in antitrust suits. [*See, e. g.,* Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120 (N.D.Cal.1970)]

We turn next to defendant's assertion of the *Noerr-Pennington* doctrine. The two primary cases comprising the doctrine are Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr,* a group of trucking companies and their trade association brought suit against a group of railroads, a railroad association, and a public relations firm for alleged violations of sections 1 and 2 of the Sherman Act. The Complaint charged that defendants had conducted a deceptive publicity campaign against the trucking industry with the purpose of fostering the "adoption and retention of laws and law enforcement practices destructive of the trucking business . . . and to impair the relationships existing between the truckers and their customers." [365 U.S. at 129, 81 S. Ct. at 525] In holding that the Complaint did not state an actionable claim under the antitrust laws, the Court said:

[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of 'combination[s] . . . in restraint of trade,' they bear very little if any resemblance to the combinations normally held violative of the Sherman Act . . . . [*Id.* at 136, 81 S.Ct. at 529]

In reaching this conclusion, the Court relied primarily on its construction of

the Sherman Act. Not only was the Act not intended to prohibit "acts of government" [see, e. g., Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); United States v. Rock Royal Co-Operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939)], but it was also not intended to regulate "political activity" of private persons. Additionally, the Court observed that the right to petition, guaranteed by the First Amendment, might be invaded by application of the antitrust laws to lobbying and other attempts to influence governmental policy. [365 U.S. at 137–38, 81 S.Ct. at 523]

Four years later, in the *Pennington* case, the Court reiterated the teachings of *Noerr* and clarified the scope of its application. *Pennington* involved a conspiracy of large coal producers to sway the Secretary of Labor and officials of the Tennessee Valley Authority in their decisions regarding minimum wages and purchase contracts. The purpose of the conspiracy was to "cost squeeze" smaller coal producers and to destroy their capacity to sell coal to TVA. The Complaint charged that the attempts to influence governmental decision-making were part of a broader conspiracy to restrain trade. The lower courts held that since the purpose of the conspiracy went beyond "influencing the passage or enforcement of laws," the antitrust immunity recognized in *Noerr* was not available to the defendants. In reversing, the Supreme Court said:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. [381 U.S. at 670, 85 S.Ct. at 1593]

AMPI contends that its alleged conduct was an attempt to influence governmental policy within the meaning of the *Noerr-Pennington* doctrine. To the extent the Complaint charges defendant with efforts to persuade the Department of Agriculture to take specific action of a regulatory nature, AMPI's claim appears well-founded. But plaintiffs maintain that *Noerr-Pennington* is inapplicable for several reasons: first, because defendant's efforts to influence the Department of Agriculture included bribery and illegal campaign contributions, activities which are certainly not protected by the First Amendment. This argument imputes a unitary character to the "exemption" doctrine, wherein the statutory construction and First Amendment rationales stated by the Supreme Court are seen as coextensive. This would mean that conduct is exempt from the Sherman Act only where it is both "essentially dissimilar" from that normally prohibited by the Act *and* where it is also a legitimate exercise of the rights of petition and association.

We reject this reasoning. In *Noerr*, the defendants had allegedly engaged in deliberate deception of "the public and public officials." The Court notes that such deception, "reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." [365 U.S. at 145, 81 S.Ct. at 533] The Court does not explicitly tell us whether or not such "reprehensible" conduct might be within the guarantees of the First Amendment. But resolution of that issue was unnecessary since the *conduct itself* was outside the intended scope of the Sherman Act.

The same argument raised by plaintiffs here was also raised in Schenley Industries, Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n, 272 F.Supp. 872 (D.N.J.1967):

> Schenley [plaintiff] continues to suggest that the lobbying itself, if sufficiently illegal apart from its antitrust aspect, is not shielded from liability under the Sherman Act. Schenley argues that *Noerr* and *Pennington* protect lobbying merely misleading or unethical, but do not extend to acts flagrantly violative of state law.
>
> · · · · · ·
>
> [Thus] Schenley reads *Noerr* as merely expressing the Court's disin-

terest in the sharp practices of misrepresentations of some lobbying specialists. On the contrary, the Court first weighed several considerations that convinced it Congress had not intended the Sherman Act to reach political activity which produced restraints on commerce via governmental acts or policies. The Court then found the same considerations impelled the conclusion that the nature of the lobbying methods employed was legally irrelevant for antitrust purposes. Since political activity to influence public officials is beyond the purview of the Act, it does not matter that independently illegal acts can be shown; separate civil or criminal actions might lie against the perpetrators, but the lobbying is not thereby transmuted into a violation of the Act. [*Id.* at 884, 885 (footnotes omitted)]

Similarly, in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), cited by plaintiffs, the court refused to "equate immunity with legality . . . ." [*Id.* at 34, n. 9] [*See also*, Metro Cable Co. v. CATV of Rockford, Inc., 375 F.Supp. 350 (N.D.Ill.1974)]

■ ■ We have no doubt that in the typical case an antitrust defendant who successfully asserts the *Noerr-Pennington* doctrine has engaged in "political activity" which is both beyond the ambit of the Sherman Act and within the protections of the First Amendment. However, this does not exhaust the possibilities of the doctrine. Some conduct may not be the subject of a Sherman Act suit even though it is *not* conduct protected by the First Amendment. Whether this is truly a matter of "exemption" or simply a threshold question of the limits of the Sherman Act, it is clear that activities which Congress did not intend to be regulated or proscribed by the antitrust laws are not brought within such laws *merely* because the activities are outside First Amendment protections or even because they may be illegal under statutes *other* than the Sherman Act. Consequently, construction of the Sherman Act and recognition of its limitations may exclude from the operation of antitrust laws some activities which would not be exempt under the narrower, First Amendment rationale of the *Noerr-Pennington* doctrine. It appears then that AMPI is not automatically stripped of its antitrust immunity by plaintiffs' allegations of bribery and illegal campaign contributions.

■ Although unethical or illegal conduct is not subject to antitrust regulation simply because it is unethical or illegal, there are still many situations in which activities, seemingly directed at influencing governmental policy, are not exempt from the antitrust laws. In *Noerr*, the Supreme Court observed:

There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt *to interfere directly* with the business relationships of a competitior and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices. . . . Under these circumstances, we conclude that no attempt to interfere with business relationships *in a manner proscribed by the Sherman Act* is involved in this case. [365 U.S. at 144, 81 S.Ct. at 533 (emphasis added)]

This indicates that one does not escape Sherman Act proscriptions by camouflaging true antitrust violations with the plumage of "political activity."

■ In line with the general practice of strictly construing antitrust immunity, courts have seized on this language in *Noerr* and discovered numerous examples of "sham" attempts to influence governmental policy. In George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., *supra,* the court held that an attempt to influence public officials in

their choice of products to be purchased for the government was not a genuine effort to influence governmental *policy* within the meaning of the *Noerr-Pennington* doctrine. In short, what superficially appeared to be "political activity" was in reality "commercial activity" with the government as the "consumer." [*See also,* Hecht v. Pro-Football, Inc., 144 U.S.App.D.C. 56, 444 F.2d 931 (1971) (government as lessor)] [2] Though plaintiffs cite these cases in urging that we apply the sham caveat to their Complaint, we decline to do so because they are clearly inapposite. There is no allegation here of any "consumer" or "non-policy" decisions by the executive branch of government. To the contrary, the restraint of competition which plaintiffs assert is the result of price regulation by the Department of Agriculture. This is a policy determination expressly committed to the Department's discretion by Congress [7 U.S.C. § 608c(18)], and it is inextricably linked to the broader economic policies of the federal government. [7 U.S.C. § 602]

Courts have fashioned other exceptions to the *Noerr-Pennington* doctrine, most of which are irrelevant to the case at bar.[3] But one line of precedent does bear some resemblance to the allegations now before us. These are cases in which the nature of *defendant's conduct,* and not the nature of the *governmental acts,* lead to the court's application of the sham exception. The leading

precedent is California Motor Transport Co. v. Trucking, Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). There the antitrust defendants had allegedly brought "baseless, repetitive claims" before administrative and judicial tribunals as part of a sophisticated scheme to foreclose their competitors from "free and unlimited access" to those same tribunals. In rejecting the defendants' assertion of the *Noerr-Pennington* doctrine, the Court said:

> Petitioners rely on our statement in *Pennington* that 'Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.' 381 U.S., at 670, 85 S.Ct. at 1593. In the present case, however, the allegations are not that the conspirators sought 'to influence public officials,' but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process. [404 U.S. at 511–12, 92 S.Ct. at 612]

The Court found that the defendants were not exercising their rights to petition the government. Their *apparent* exercise of First Amendment rights in seeking adjudication was a "smokescreen" for what was "actually nothing more than an attempt to interfere directly with the business relationships of a competitor." [*Id.* at 511, 92 S.Ct. at 612, citing *Noerr, supra* at 144, 81 S.Ct. at 523] [4] [*See also,* Otter Tail Power

2. These cases do not necessarily represent the "majority view." The *Pennington* case itself involved efforts to influence TVA officials regarding their purchase of coal, yet the Supreme Court does not suggest that this distinguishes *Pennington* from *Noerr.* [*See also,* Household Goods Carriers' Bureau v. Terrell, 452 F.2d 152 (5th Cir. 1971); United States v. Johns-Manville Corp., 245 F.Supp. 74 (E.D.Pa.1965)]

3. These other exceptions are catalogued in Annot., 17 ALR Fed 645, 650 (1973).

4. While concurring in the judgment, Mr. Justice Stewart criticized the majority opinion in *California Transport* because it apparently retreated from the broad holding in *Noerr.* However, the majority treats its

holding as an extension or direct application of the "sham" language appearing in *Noerr.* The defendants' anticompetitive intent or purpose in seeking to influence governmental policy was irrelevant in *Noerr,* while in *California Transport, evidence* of such intent or purpose in combination with other factors (i. e., "baseless, repetitive claims") brought the activities within the sham exception. To the extent that *California Transport* departs from *Noerr,* we believe the latter is controlling in this case. Language throughout the majority opinion in *California Transport* indicates that the nature of "political activity" is essentially different in a legislative or executive context than in an adjudicative one. Thus, *California Transport* represents the sham exception, "as adapted to the adjudica-

Co. v. United States, 410 U.S. 366, 93 S. Ct. 1022, 35 L.Ed.2d 359 (1973)]

The case applying *California Transport* which is most helpful to plaintiffs is Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272 (1972), where defendants (including an official of the Food and Drug Administration) had allegedly conspired to keep a drug manufactured by the plaintiff off the interstate market. In particular, plaintiff charged the conspirators with suppressing, concealing, and misrepresenting information presented to the FDA. The district court granted defendants' motion to dismiss, in part, on *Noerr-Pennington* grounds. The circuit court reversed, finding that plaintiff had sufficiently alleged facts falling within the sham exception, as set forth in *California Transport*. Plaintiff had asserted that defendants' "real purpose" was not to petition the agency, but rather to abuse its processes as an "attempt to interfere directly with the business relationships of a competitor." [*Id.* at 279; *see also*, Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971)] [5]

■ The present case is entirely different from *Israel* and other cases in which the sham exception was applied. The Complaint here contains no allegation even remotely suggesting an "attempt to interfere directly with the busi-

ness relationships of competitors." Indeed, there is no charge of an attempt to adversely affect any competitive features of the milk industry. Though bribery and illegal campaign contributions may constitute abuses of the administrative process, they do not, in the context alleged here, suggest an ulterior purpose to harm competition.[6] This is simply not a case of the antitrust violation masquerading as "political activity."

■ Finally, plaintiffs urge us to pierce the shield of *Noerr-Pennington* because the Complaint alleges a conspiracy which includes "representatives of the United States government." In Harman v. Valley National Bank of Arizona, 339 F.2d 564 (9th Cir. 1964), the court held that *Noerr* was not controlling where the plaintiff alleged that a state official was a co-conspirator and that such conspiracy was part of a larger, essentially private scheme to monopolize an industry. [*See also*, Independent Taxicab Operators' Ass'n of San Francisco v. Yellow Cab Co., 278 F.Supp. 979 (N.D.Cal.1968)] There is no allegation in the present case that AMPI conspired with government officials as part of a "larger, essentially private scheme" to restrain competition. Moreover, after the Supreme Court's holding in *Pennington*, the Ninth Circuit has disapproved its decision in *Harman*. [*See*, Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th

---

tory process." [404 U.S. at 516, 92 S.Ct. at 614; *see also*, Semke v. Enid Automobile Dealers Ass'n, 456 F.2d 1361 (10th Cir. 1972)] Of course, the present case does not involve adjudication in any form.

5. Of particular note is the decision of Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F.Supp. 1019 (S. D.Tex.1972). There the court, following *California Transport* and *Woods Exploration*, *supra*, held that AMPI was not entitled to antitrust immunity where plaintiff charged AMPI with attempts to "load the pool" governed by a federal milk marketing order. This was a clear allegation of an attempt to manipulate the regulatory process so as to interfere directly with competition. Such an allegation is not present in the in-

stant controversy. [*See*, discussion immediately following note 5 in text.]

6. In their brief, plaintiffs argue:
By its illegal activities, defendant has insulated plaintiffs from effectively seeking from the Department of Agriculture, at least during the complaint years, an increase in the parity prices of milk.
Though the political sensitivity of milk prices may have decreased plaintiffs' chances of successfully persuading the Department of Agriculture to raise the minimum price, this is certainly not the foreclosure which would render AMPI's activity a mere sham within the meaning of *California Transport*. Plaintiffs do not allege that such foreclosure was the object of the conspiracy, or that AMPI attempted to interfere directly with competition.

Cir. 1969); *see also*, Parmelee Transportation Co. v. Keeshin, 292 F.2d 794 (7th Cir.), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961); Note, 81 Harv.L.Rev. 847, 856–57 (1968)]

In light of the foregoing analysis, we conclude that all of plaintiffs' arguments against application of the *Noerr-Pennington* doctrine must be rejected. AMPI allegedly sought to influence decisions of the Department of Agriculture —decisions which were in fact policy determinations. Even though the means of such influence may be illegal under conflict of interest statutes or other laws, the conspiracy itself is "essentially dissimilar" from those prohibited by the Sherman Act. [*See also*, George Benz & Sons v. Twin City Milk Producers Ass'n, 299 F.Supp. 679 (D.Minn.1969); Metro Cable Co. v. CATV of Rockford, Inc., *supra*; *cf.*, United States v. Boston & M. R. Co., 380 U.S. 157, 162, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965)] In fact, the harm to competition of which plaintiffs complain is, by their own allegations, wholly at odds with the object of the alleged conspiracy.

The inaction of the Department of Agriculture may well have been necessitated by a political atmosphere for which AMPI is partly or wholly responsible. This responsibility, whatever its implications to other civil or criminal actions, cannot impute to AMPI any liability under the Sherman Act. To hold otherwise would stretch the Sherman Act beyond its intended scope and eventually dilute its effectiveness as a means of regulating competition.

We are mindful of the generally hostile judicial attitude toward summary disposition of antitrust cases. [*See, e. g.*, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)] However, it is an established corollary that where the factual allegations and legal issues are clearly presented and where one side or the other must, as a matter of law, prevail, then a judgment on the pleadings or other summary relief should not be withheld. [*See, e. g.*, Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, 382 F.2d 925 (10th Cir. 1967)] Accepting as true all allegations contained in the Complaint and assuming all possible inferences therefrom, we are unable to ascertain any antitrust claim for which relief may be granted. It is, therefore,

Ordered that defendant's motion to dismiss be, and the same hereby is, granted, and that plaintiffs' Complaint and cause of action be, and the same hereby are, dismissed.